IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Global Commerce Bank,** | ) ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | |
| **FIRST ONE GROUP, LLC; JERRY C. KIM; JOE P. KIM; and JIMMY JONG IK HWANG,** | ) ) ) | **CIVIL ACTION FILE** |
| | ) | **NO.1:12-CV-01815-CAP** |
| Defendants. | ) | |
| | ) | |
| **FIRST ONE GROUP, LLC,** | ) | **JURY DEMANDED** |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Global Commerce Bank,** | ) ) ) ) | |
| Counterclaim Defendant. | ) | |
| **FIRST ONE GROUP, LLC,** | ) | |
| Third-Party Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| **TEAM SPIRIT REALTY & INVESTMENT, INC.; JOHN H. KIM; SAMUEL CHEN; ELAINE ZHOU; THE NORTH POINT GROUP, INC.; and RONALD ONORATO,** | ) ) ) ) ) ) ) ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## DEFENDANT FIRST ONE GROUP, LLC'S ANSWER, DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS FILED IN RESPONSE TO PLAINTIFF'S FIRST AMENDED COMPLAINT

COMES NOW, Defendant First One Group, LLC ("First One"), by and through its undersigned counsel, and does hereby file its (a) Answer and Defenses to the First Amended Complaint of Plaintiff Federal Deposit Insurance Corporation, as Receiver for Global Commerce Bank ("the Bank"), (b) Counterclaims against the Bank and (c) Third-Party Claims against Third-Party Defendants Team Spirit Realty & Investment, Inc., John H. Kim, Samuel Chen, Elaine Zhou, The Northpoint Group, Inc., and Ronald Onorato, and shows this Court as follows:

### FIRST AFFIRMATIVE DEFENSE

The Bank's Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

The Bank's claims are barred by fraud and illegality.

### THIRD AFFIRMATIVE DEFENSE

The Bank has failed to satisfy all conditions precedent to recovery on the alleged breach of contract claims.

## FOURTH AFFIRMATIVE DEFENSE

The Bank's claims are barred by waiver.

## FIFTH AFFIRMATIVE DEFENSE

The Bank's claims are barred by estoppel.

## SIXTH AFFIRMATIVE DEFENSE

The Bank's claims are barred by the doctrine of accord and satisfaction.

## SEVENTH AFFIRMATIVE DEFENSE

The Bank has unclean hands.

## EIGHTH AFFIRMATIVE DEFENSE

The Bank's claims are barred by consent.

## NINTH AFFIRMATIVE DEFENSE

The Bank's claims are barred by failure of consideration.

## TENTH AFFIRMATIVE DEFENSE

The Bank's claims are barred by laches.

## ELEVENTH AFFIRMATIVE DEFENSE

The Bank's claims must fail because of a lack of consideration for the alleged loans.

## TWELFTH AFFIRMATIVE DEFENSE

Defendant Jerry C. Kim ("Jerry Kim") lacked authority to enter into the alleged promissory notes and deeds to secure debt.

## THIRTEENTH AFFIRMATIVE DEFENSE

The Bank's claimed damages were caused by the Bank and its employees and by others.

## FOURTEENTH AFFIRMATIVE DEFENSE

The Bank has failed to mitigate its alleged damages, and the failure of the Bank to mitigate its damages acts as a bar to the Bank's recovery from First One.

## FIFTEENTH AFFIRMATIVE DEFENSE

The Bank's claims are barred by assumption of risk.

## SIXTEENTH AFFIRMATIVE DEFENSE

The Bank's claims are barred by contributory negligence.

## SEVENTEENTH AFFIRMATIVE DEFENSE

The Bank's claims are barred by release.

## EIGHTEENTH AFFIRMATIVE DEFENSE

The Bank's claims are barred by assumption of risk.

## NINETEENTH AFFIRMATIVE DEFENSE

Jerry Kim colluded with the Bank and the Third-Party Defendants to impose debt obligations on First One and to secure the obligations with assets of First One, all for their own benefit and to the detriment of First One.

## TWENTIETH AFFIRMATIVE DEFENSE

Jerry Kim colluded with the Bank and the Third-Party Defendants to defraud First One.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

The Bank breached its duties of reasonable care in the underwriting and administration of the loans.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Bank breached its obligations under the loan documents and its obligations of good faith and fair dealing.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

The promissory notes and deeds to secure debt are personal obligations of Jerry Kim and not obligations of First One.

## ANSWER

Responding to the specific enumerated paragraphs of Bank's First Amended Complaint ("Complaint") First One shows as follows:

1.

First One denies the allegations contained in Paragraph No. 1 of Bank's Complaint, and states that the allegations in the Complaint speak for themselves.

2.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 2 of Bank's Complaint, and therefore must deny the same.

3.

First One denies the allegations contained in Paragraph No. 3 of Bank's Complaint, except First One admits that a substantial part of the events or omissions giving rise to the claims of the Bank and First One occurred in this judicial district.

4.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 4 of Bank's Complaint, and therefore must deny the same.

5.

First One admits the allegations contained in Paragraph No. 5 of Bank's Complaint with respect to First One and Bank, but First One lacks knowledge or

information sufficient to form a belief as to the allegations set forth in Paragraph No. 5 of Bank's Complaint with respect to Jerry Kim, Joe P. Kim and Jimmy Jong Ik Hwang.

6.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 6 of Bank's Complaint, and therefore must deny the same.

7.

First One denies the allegations contained in Paragraph No. 7 of Bank's Complaint, except First One admits that FDIC-R filed a Notice of Removal.

8.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 8 of Bank's Complaint, and therefore must deny the same.

9.

First One admits the allegations contained in Paragraph No. 9 of Bank's Complaint.

10.

First One lacks knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph No. 10 of Bank's Complaint, and therefore must deny the same; except First One admits that Jerry Kim was the manager of First One on the date of the Notes.

11.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 11 of Bank's Complaint, and therefore must deny the same.

12.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 12 of Bank's Complaint, and therefore must deny the same.

13.

First One denies the allegations contained in Paragraph No. 13 of Bank's Complaint, except First One admits that Jerry Kim signed Note No. 1 attached as Exhibit "A" to Bank's Complaint, but states that he did so without authority of First One, and that Jerry Kim acted in collusion with the Bank, and Note No. 1 was made by Jerry Kim in consideration for a loan fraudulently made by the Bank and

for which First One did not receive any consideration, and therefore Note No. 1 lacked valid consideration.

14.

First One denies the allegations contained in Paragraph No. 14 of Bank's Complaint, except admits that Jerry Kim signed the Deed to Secure Debt and Security Agreement attached as Exhibit "B" to Bank's Complaint, but states that he did so without authority of First One, and that Jerry Kim acted in collusion with the Bank, and said Deed to Secure Debt and Security Agreement was made by Jerry Kim in consideration for a loan fraudulently made by the Bank, and First One did not receive any consideration, and therefore the alleged Deed to Secure Debt and Security Agreement lacked valid consideration.

15.

First One denies the allegations contained in Paragraph No. 15 of Bank's Complaint, except admits that Jerry Kim signed the Commercial Loan Modifications, dated December 3, 2008, June 30, 2009 and January 21, 2010 attached as Exhibit "C" to Bank's Complaint, but states that he did so without authority of First One, and that Jerry Kim acted in collusion with the Bank, and that the underlying Note No. 1 was made by Jerry Kim in consideration for a loan fraudulently made by the Bank, and First One did not receive any consideration,

and therefore the alleged Loan Modifications dated December 3, 2008, June 30, 2009, and January 2, 2010 lacked valid consideration.  First One further admits that it filed a lawsuit in March, 2010 against Jerry Kim, entitled *First One Group, LLC v. Jerry C. Kim and Lydia Kim,* in the Superior Court of Gwinnett County, State of Georgia, bearing Civil Action No. 10-A-02019-6, for several reasons and to achieve several purposes, among which purposes was to obtain return of the business records of First One from Jerry Kim, and First One further states, that as of April 22, 2010, and despite an order of the Superior Court of Gwinnett County entered on March 9, 2010 requiring Jerry Kim to return all the business records of First One, the business records concerning the loan closing for Note No. 1 were not returned by Jerry Kim to First One, and were not available to First One and were being concealed by Jerry Kim, and that the new Manager of First One, Steve Bae, signed the Commercial Loan Modification dated April 22, 2010 based upon the Bank's representations, among others, that the Commercial Loan Modification had to be signed in order to defer enforcement action by the Bank and that the loan underlying Note No.1 was a valid loan, but that only after a non-party witness, the closing attorney for Note No. 1, responded to discovery in that other lawsuit, and only after further checking account records were obtained and searched and attempts were made to match those records, was it learned that the loan underlying

Note No. 1 was illegally obtained and used solely for the purposes of the Bank and Jerry Kim, specifically, among other reasons, to allow Bank to increase its apparent asset base and to receive a loan commitment fee, and to evade legal lending requirements and the loan-to-value ratio, and to make it appear to bank regulators that First One was investing the costs of tenant improvements in the underlying property allegedly serving as collateral for the loan underlying Notes 1 and 2, and to allow Jerry Kim to personally receive money from the purchase proceeds and tenant improvement allowance.

16.

First One denies the allegations contained in Paragraph No. 16 of Bank's Complaint, except admits that Jerry Kim signed Note No. 2 attached as Exhibit "E" to Bank's Complaint, but states that he did so without authority of First One, and that Jerry Kim acted in collusion with the Bank, and Note No. 2 was made by Jerry Kim in consideration for a loan fraudulently granted by the Bank, and First One did not receive any consideration for said loan, and therefore Note No. 1 lacked valid consideration.

17.

First One denies the allegations contained in Paragraph No. 17 of Bank's Complaint, except admits that Jerry Kim signed the Deed to Secure Debt and

Security Agreement attached as Exhibit "F" to Bank's Complaint, but states that he did so without authority of First One, and that Jerry Kim acted in collusion with the Bank, and said Deed to Secure Debt and Security Agreement was made by Jerry Kim in consideration for a loan fraudulently granted by the Bank, and First One did not receive any consideration, and therefore the alleged Deed to Secure Debt and Security Agreement lacked valid consideration.

18.

First One denies the allegations contained in Paragraph No. 18 of Bank's Complaint, except admits that Jerry Kim signed the Commercial Loan Modifications, dated December 3, 2008, June 30, 2009, and January 21, 2010 attached as Exhibit "G" to Bank's Complaint, but states that he did so without authority of First One, and that Jerry Kim acted in collusion with the Bank, and that the underlying Note No. 2 was made by Jerry Kim in consideration for a loan fraudulently granted by the Bank, and First One did not receive any consideration for the loan, and therefore the alleged Loan Modifications dated December 3, 2008, June 30, 2009 and January 21, 2010 lacked valid consideration. First One further admits that it filed a lawsuit in March, 2010 against Jerry Kim, entitled *First One Group, LLC v. Jerry C. Kim and Lydia Kim,* in the Superior Court of Gwinnett County, State of Georgia, bearing Civil Action No. 10-A-02019-6, for

several reasons and to achieve several purposes, among which purposes was to obtain return of the business records of First One from Jerry Kim, and First One further states, that as of April 22, 2010, and despite an Order of the Superior Court of Gwinnett County entered on March 9, 2010, requiring Jerry Kim to return all the business records of First One, the business records concerning the loan closing for Note No. 2 were not returned by Jerry Kim to First One, and were not available to First One and were being concealed by Jerry Kim, and that the new Manager of First One, Steve Bae, signed the Commercial Loan Modification dated April 22, 2010 based upon the Bank's representations, among others, that the Commercial Loan Modification had to be signed in order to defer enforcement action by the Bank and that the loan underlying Note No. 2 was a valid loan, but that only after a non-party witness, the closing attorney for Note No. 2, responded to discovery in that other lawsuit, and only after further checking account records were obtained and searched and attempts were made to match those records, was it learned that the loan underlying Note No. 2 was illegally obtained and used solely for the purposes of the Bank and Jerry Kim, specifically, among other reasons, to allow Bank to expand its asset base and to obtain a commitment fee, and to evade legal lending requirements and the loan to value ratio, and to make it appear to bank regulators that First One was investing the costs of tenant improvements in the

underlying property allegedly serving as collateral for the loan underlying Notes 1 and 2, and to allow Jerry Kim to personally receive money from the purchase proceeds and tenant improvement allowance.

19.

First One denies the allegations contained in Paragraph No. 19 of the Bank's Complaint, but otherwise admits that if anyone is liable for the amounts alleged to be due then Jerry Kim, Joe Kim and Jimmy Jong Ik Hwang are liable for the alleged amounts due.

20.

First One denies the allegations contained in Paragraph No. 20 of the Bank's Complaint, but otherwise admits that if anyone is liable for the amounts alleged to be due then Jerry Kim, Joe Kim and Jimmy Jong Ik Hwang are liable for the alleged amounts due.

21.

First One denies the allegations contained in Paragraph No. 21 of Bank's Complaint.

22.

First One denies the allegations contained in Paragraph No. 22 of Bank's Complaint.

23.

First One denies the allegations contained in Paragraph No. 23 of Bank's Complaint, and states that the Commitment Letter speaks for itself.

24.

First One denies the allegations contained in Paragraph No. 24 of Bank's Complaint, and sates that the Settlement Statement speaks for itself.

25.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 25 of Bank's Complaint, and therefore must deny the same.

26.

First One lacks knowledge or information sufficient to form a belief as to the contained in Paragraph No. 26 of Bank's Complaint, and therefore must deny the same.

27.

First One denies the allegations contained in Paragraph No. 27 of Bank's Complaint, and sates that the Settlement Statement and Commitment letter speak for themselves.

28.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 28 of Bank's Complaint, and therefore must deny the same.

29.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 29 of Bank's Complaint, and therefore must deny the same.

30.

First One lacks knowledge or information sufficient to form a belief as to the contained in Paragraph No. 30 of Bank's Complaint, and therefore must deny the same.

31.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 31 of Bank's Complaint, and therefore must deny the same.

32.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 32 of Bank's Complaint, and therefore must deny the same.

33.

First One lacks knowledge or information sufficient to form a belief as to the contained in Paragraph No. 33 of Bank's Complaint, and therefore must deny the same.

34.

First One denies the allegations contained in Paragraph No. 34 of the Bank's Complaint, except states that the Wiring Instructions speak for themselves.

35.

First One denies the allegations contained in Paragraph No. 35 of Bank's Complaint, except sates that the Settlement Statement speaks for itself.

36.

First One denies the allegations contained in Paragraph No. 36 of Bank's Complaint, except admits that Jerry Kim signed the Escrow Agreement, but states that he did so without authority of First One, and that Jerry Kim acted in collusion with the Bank, and said Escrow Agreement was made by Jerry Kim in

consideration for a loan fraudulently made by the Bank, and First One did not receive any consideration, and therefore the alleged Escrow Agreement lacked valid consideration.

37.

First One denies the allegations contained in Paragraph No. 37 of Bank's Complaint, except admits that Community One is identified as the escrow agent, except sates that the Escrow Agreement speaks for itself.

38.

First One denies the allegations contained in Paragraph No. 38 of Bank's Complaint, except sates that the Escrow Agreement speaks for itself.

39.

First One denies the allegations contained in Paragraph No. 39 of Bank's Complaint, except admits that Jerry Kim signed the Personal Property Trust Agreement, but states that he did so without authority of First One, and that Jerry Kim acted in collusion with the Bank, and said Personal Property Trust Agreement was made by Jerry Kim in consideration for a loan fraudulently made by the Bank, and First One did not receive any consideration, and therefore the alleged Personal Property Trust Agreement lacked valid consideration.

40.

First One denies the allegations contained in Paragraph No. 40 of the Trust Agreement, except states that the Trust Agreement speaks for itself.

41.

First One denies the allegations contained in Paragraph No. 41 of the Trust Agreement, except states that the Trust Agreement speaks for itself.

42.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 42 of Bank's Complaint, and therefore must deny the same.

43.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 43 of Bank's Complaint, and therefore must deny the same.

44.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 44 of Bank's Complaint, and therefore must deny the same.

45.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 45 of Bank's Complaint, and therefore must deny the same.

46.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 46 of Bank's Complaint, and therefore must deny the same.

47.

First One denies the allegations contained in Paragraph No. 47 of Bank's Complaint, except admits that it did not receive a written approval of completed plans and construction drawings from the Condominium Association and that it did not submit a building permit.

48.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 48 of Bank's Complaint, and therefore must deny the same.

49.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 49 of Bank's Complaint, and therefore must deny the same.

50.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 50 of Bank's Complaint, and therefore must deny the same.

51.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 51 of Bank's Complaint, and therefore must deny the same.

52.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 52 of Bank's Complaint, and therefore must deny the same.

53.

First One denies the allegations contained in Paragraph No. 53 of Bank's Complaint, except admits that Synetics Trust issued a check dated June 2, 2008 in the amount of $38,500 made payable to First One Group, LLC.

54.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 54 of Bank's Complaint, and therefore must deny the same; and states that the Decorating Allowance Agreement speaks for itself.

55.

First One denies the allegations contained in Paragraph No. 55 of Bank's Complaint, except admits that it stopped making payments on the Notes at some point in time.

56.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 56 of Bank's Complaint, but admits that First One was served with a Complaint naming the Bank as the plaintiff and bearing a Gwinnett County Superior Court "Filed" stamp dated December 27, 2010.

57.

First One repeats and realleges each Affirmative Defense and each and every answer and allegation set forth above in Paragraphs 1 though 56 of its Answer, and incorporates the same by reference as though fully set forth herein.

58.

First One denies the allegations contained in Paragraph No. 58 of Bank's Complaint, except admits that it stopped making payments on the Notes at some point in time.

59.

First One denies the allegations contained in Paragraph No. 59 of Bank's Complaint, except admits that it stopped making payments on the Notes at some point in time.

60.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 60 of Bank's Complaint, and therefore must deny the same.

61.

First One lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph No. 61 of Bank's Complaint, and therefore must deny the same.

62.

First One denies the allegations contained in Paragraph No. 62 of Bank's Complaint.

63.

First One denies the allegations contained in Paragraph No. 63 of Bank's Complaint.

64.

First One repeats and realleges each Affirmative Defense and each and every answer and allegation set forth above in Paragraphs 1 though 63 of its Answer, and incorporates the same by reference as though fully set forth herein.

65.

First One denies the allegations contained in Paragraph No. 65 of Bank's Complaint, except admits that it stopped making payments on the Notes at some point in time.

66.

First One denies the allegations contained in Paragraph No. 66 of Bank's Complaint.

67.

First One denies the allegations contained in Paragraph No. 67 of Bank's Complaint.

68.

First One denies the allegations contained in Paragraph No. 68 of Bank's Complaint.

69.

First One denies the allegations contained in Paragraph No. 69 of Bank's Complaint.

70.

First One denies the allegations contained in Paragraph No. 70 of Bank's Complaint.

71.

First One denies the allegations contained in Paragraph No. 71 of Bank's Complaint.

72.

First One denies the allegations contained in Paragraph No. 72 of Bank's Complaint.

73.

First One denies the allegations contained in Paragraph No. 73 of Bank's Complaint.

74.

First One denies the allegations contained in Paragraph No. 74 of Bank's Complaint.

75.

First One denies the allegations contained in Paragraph No. 75 of Bank's Complaint.

76.

First One denies the allegations contained in Paragraph No. 76 of Bank's Complaint.

77.

First One denies the allegations contained in Paragraph No. 77 of Bank's Complaint.

78.

First One denies the allegations contained in Paragraph No. 78 of Bank's Complaint.

79.

Any allegation contained in the First Amended Complaint which is not admitted or denied upon information and belief, or is not otherwise addressed in this Answer hereinabove, is hereby expressly denied.

WHEREFORE, First One respectfully requests that the First Amended Complaint be dismissed with prejudice, that the Bank take nothing by the way of its Complaint, and that final judgment been entered in favor of First One and that all costs be cast against the Bank.

## DEFENDANT FIRST ONE GROUP, LLC'S COUNTERCLAIM AGAINST PLAINTIFF

COMES NOW Defendant and Counterclaim Plaintiff First One Group, LLC ("First One") and hereby files this Counterclaim against Plaintiff Federal Deposit Insurance Corporation, as Receiver for Global Commerce Bank ("the Bank"), and shows the following:

1.

First One repeats and realleges each Affirmative Defense and each and every allegation set forth above in Paragraphs 1 though 79 of its Answer and incorporates the same by reference as though fully set forth herein.

2.

The counterclaims arise out of the transactions or occurrences that are the subject matter of the Bank's claims against First One, and do not require adding other parties over whom this Court cannot acquire jurisdiction.

3.

Alternatively, the counterclaims are permissive counterclaims.

4.

This Court has subject matter jurisdiction and venue over these counterclaims and personal jurisdiction over the Bank.

5.

On September 10, 2007, Jerry Kim made a written offer (the "Offer"), purportedly on behalf of First One, to purchase from Point Satellite, LLC (the "Seller") part of the first floor of an office condominium known as Suites 101, 102, 103 and 104 of Building A of the Point Satellite Condominium and located at 302 Satellite Boulevard, NE, Suwanee, Georgia 30024 (the "Property").

6.

The Northpoint Group, Inc. ("Northpoint") was the developer of Point Satellite Condominium.  The Chief Executive Officer and 100% shareholder of Northpoint was Ronald C. Onorato ("Onorato").  Onorato was also the Managing Member of the Seller.  Northpoint and the Seller retained Team Spirit Realty & Investment, Inc. ("Team Spirit") as their real estate agent to sell the Property.  The Chief Executive Officer of Team Spirit was John H. Kim ("John Kim").

7.

The Offer was for a proposed purchase price of TWO MILLION EIGHT HUNDRED EIGHTY-NINE THOUSAND DOLLARS ($2,889,000), and it contained a financing contingency which would permit Jerry Kim to cancel the purchase unless he was able to obtain a loan for TWO MILLION EIGHT HUNDRED EIGHTY-NINE THOUSAND DOLLARS ($2,889,000), or ONE HUNDRED PER CENT (100%) of the entire purchase price, and the Offer had "$0" allowed by the Seller for build-out of tenant improvements to the empty space.

8.

At the time of the Offer, Jerry Kim had never operated an adult day healthcare facility; First One had no business need to purchase the Property; First

One did not have a license from the State of Georgia to operate as an adult day healthcare facility; First One did not have one (1) single client; First One did not have any revenues; in the month before the Offer, First One had entered into a five (5) year lease for other premises that had a capacity for 240 clients; in the licensing application to the State of Georgia for First One, Jerry Kim had represented that the license was needed for First One to operate an adult day healthcare facility at the premises it had leased for five (5) years, not at the Property; and the Property was not built-out with tenant improvements and merely consisted of the shell of part of the first floor of an existing commercial building.

9.

On February 13, 2008, Jerry Kim personally, and not on behalf of First One, entered into the Point Satellite Condominium Purchase Agreement (the "Contract") with the Seller to purchase the Property from the Seller for THREE MILLION TWO HUNDRED AND TEN THOUSAND DOLLARS ($3,210,000). At the time of the Contract, the Property was not built-out with tenant improvements and merely consisted of the shell of part of the first floor of an existing commercial building. At the time of the Offer, Jerry Kim had never operated an adult day healthcare facility; First One had no business need to purchase the Property; First One did not have a license from the State of Georgia to operate as an adult day

healthcare facility; First One did not have one (1) single client; First One did not have any revenues; in the month before the Offer, First One had entered into a five (5) year lease for other premises that had a capacity for 240 clients; in the licensing application to the State of Georgia for First One, Jerry Kim had represented that the license was needed for First One to operate an adult day healthcare facility at the premises it had leased for five (5) years, not at the Property; and the Property was not built-out with tenant improvements and merely consisted of the shell of part of the first floor of an existing commercial building.

10.

Article 30 of the Contract required the Seller to credit Jerry Kim at the time of closing the sum of FOUR HUNDRED THIRTY FOUR THOUSAND DOLLARS ($434,000.00) (the "Tenant Improvement Allowance") to be used by Jerry Kim for the purpose of making tenant improvements to the Property, but the Seller was allowed to retain ONE THOUSAND ONE HUNDRED DOLLARS ($1,100.00) of the tenant improvement allowance, and the balance of FOUR HUNDRED THIRTY-TWO THOUSAND NINE HUNDRED DOLLARS ($432,900.00) (the "Net Tenant Improvement Allowance") was to be placed in escrow by the Seller to be distributed to Jerry Kim for the construction build-out of

tenant improvements to the interior of the Property into offices in accordance with the terms of an escrow agreement to be entered into at the time of closing.

11.

Exhibit "C" to the Contract included a financing contingency wherein Jerry Kim's purchase of the Property was conditioned upon his ability to obtain a first priority mortgage loan in the amount of not less than TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000) for a term of not less than twenty (20) years.

12.

On the same day that Jerry Kim and Onorato signed the Contract, they also signed an agreement (the "Decorating Allowance Agreement") pursuant to which NorthPoint agreed to pay Jerry Kim within twenty-four (24) hours after the closing a "decorating allowance" in the amount of ONE HUNDRED SIXTY THOUSAND FIVE HUNDRED DOLLARS ($160,500.00), the same amount as the deposit Jerry Kim supposedly paid at the time of signing the Contract.

13.

The economic terms of the Contract were structured by Jerry Kim, John Kim, Team Spirit, Onorato and Northpoint to allow Jerry Kim to purchase the Property without having to make an equity contribution, to allow Jerry Kim the

ability to personally receive money from the purchase transaction, to allow Onorato or Northpoint to receive money from the purchase in addition to the sale proceeds payable to the Seller and to allow John Kim to receive a financing referral fee in addition to the real estate sales commission payable to Team Spirit. These terms included the following elements, among others:  allowing Jerry Kim to keep his deposit of $160,500, Northpoint paying Jerry Kim a "decorating allowance" of $160,500, arranging for third parties to put up the cash needed at closing, disbursing the Net Tenant Improvement Allowance to Jerry Kim and Northpoint or Onorato without any requirement that it be used for the build-out of the Property, and John Kim forming Solomon Capital, LLC ("Solomon") to receive a financing referral fee.

14.

John Kim arranged for Jerry Kim to obtain financing from the Bank to purchase the Property.  John Kim, or those acting on his behalf, contacted the Bank and explained the terms of the Contract to the Bank.

15.

Pursuant to the arrangements made by John Kim, the Contract was submitted to the Bank and a mortgage loan was requested from the Bank for TWO MILLION SEVEN HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS

($2,750,000).   The President of the Bank, Samuel Chen ("Chen"), and a loan officer of the Bank, Elaine Zhou ("Zhou") shepherded the mortgage loan request through to approval by the Bank.   By accepting the mortgage loan request, the Bank undertook a duty to underwrite the mortgage loan request with reasonable care.

16.

On April 8, 2008, Jerry Kim wrote a check on the account of First One made payable to the Bank for a loan commitment fee of TWENTY THOUSAND SIX HUNDRED TWENTY-FIVE ($20,625.00) and the Bank committed to loaning Kim TWO MILLION SEVEN HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($2,750,000) to acquire the Property.   Zhou, individually and as agent for the Bank caused the Bank to pay Solomon one-half of the commitment fee, or TEN THOUSAND THREE HUNDRED TWELVE DOLLARS and FIFTY CENTS ($10,312.50).

17.

Pursuant to regulatory requirements and the Bank's written credit criteria, the mortgage loan could not exceed seventy-five percent (75%) of the appraised value of the Property, which meant that the Property had to have an appraised value of at least THREE MILLION SIX HUNDRED SIXTY-SIX THOUSAND

SIX HUNDRED SIXTY-SEVEN DOLLARS ($3,666,667).   Knowing that the Property did not have a value that high, and assuming that the value would be the Contract purchase price of THREE MILLION TWO HUNDRED TEN THOUSAND DOLLARS ($3,210,000), Chen and Zhou, acting individually and as agents for the Bank, caused the Bank to deceptively and intentionally split the requested $2,750,000 loan into two (2) loans on paper—one loan for TWO MILLION FOUR HUNDRED FIFTY THOUSAND ($2,450,000) for acquisition of the Property, and another loan for THREE HUNDRED THOUSAND DOLLARS ($300,000.00) purportedly for working capital purposes.   The Bank then approved this loan structure, subject to an appraisal of the Property to support the seventy-five percent (75%) loan-to-value ratio.

18.

However, before obtaining an appraisal of the Property, Zhou, acting individually and as agent of the Bank, caused the Bank on April 10, 2008 to transmit the loan proceeds to its closing attorney.

19.

In order to orchestrate an appraisal to support the mortgage loan, Zhou, acting individually and as agent of the Bank, caused the Bank to retain L.D.A., Inc., supposedly an independent appraiser, to perform an appraisal of the Property.

On April 21, 2008 L.D.A., Inc., which had previously appraised other property for the Bank, issued its appraisal stating that the value of the Property in its unfinished condition was TWO MILLION SEVEN HUNDRED EIGHTY-THOUSAND DOLLARS ($2,780,000.00), and that by adding the full Tenant Improvement Allowance to the unfinished value, the future value of the Property if the tenant improvements were built by Jerry Kim, would be THREE MILLION TWO HUNDRED TWELVE THOUSAND DOLLARS ($3,212,000.00)—or just TWO THOUSAND DOLLARS ($2,000.00), or expressed as a percentage, SIX ONE-HUNDREDTHS OF ONE PERCENT (0.06 %), above the Contract purchase price and assumed value.

20.

Section 1.03 of the Loan Agreement drafted by the Bank's attorney for the THREE HUNDRED THOUSAND DOLLAR ($300,000) loan states that the purpose is to provide "working capital for the operation of an Adult Health Day Care facilities on [the Property] and at such other locations as may be approved by [the Bank] in writing."

21.

At all times prior to the closing of the loans on April 29, 2008, the Bank, Chen, Zhou, Jerry Kim, Onorato and John Kim knew that First One and Jerry Kim

were not intending to use the THREE HUNDRED THOUSAND DOLLARS ($300,000.00) line of credit for "working capital for the operation of an Adult Health Day Care facilities on [the Property]"; that the entire $300,000 and additional monies from the other loan would be paid into an escrow controlled by the Seller and Jerry Kim on the date of the closing; that First One was in the process of leasing and building out other premises for its future business operations and that First One would have no need for the Property at any time in the foreseeable future; that First One was not licensed by the State of Georgia for its intended business of operating an adult day healthcare business and receiving Medicaid patients anywhere in Georgia; that the loans would be a significant contribution to the expansion of the Bank's asset base; that an expansion of the Bank's asset base would allow the Bank to lend more money to others and to increase its profits; that a combined loan of TWO MILLION SEVEN HUNDRED FIFTY THOUSAND ($2,750,000) could only be justified to bank regulators on paper if the tenant improvements were actually made and the value of the appraisal came in over the Contract price; that the loans as evidenced by Notes 1 and 2 as alleged in the Bank's Complaint could not reasonably be expected to be repaid by First One; that Jerry Kim, the Seller, Northpoint and others were going to get cash kickbacks when the below-described escrow agreement drafted by the Bank's

attorney was entered into and the Net Tenant Improvement Allowance was paid out to Jerry Kim supposedly acting on First One's behalf; that a portion of the loans and Tenant Improvement Allowance were going to be used to reimburse Jerry Kim for the equity investment in the Property such that it would be essentially a "no money down" real estate purchase supported by an inflated appraisal; that Jerry Kim would be able to receive more than the equity investment from the loans and Tenant Improvement Allowance; and that John Kim would be paid half of the commitment fee.

22.

At the time of the request for the mortgage loan, the Bank, Chen and Zhou were aware that the effect of crediting Jerry Kim with the Net Tenant Improvement Allowance was to create a true purchase price of TWO MILLION SEVEN HUNDRED SEVENTY-SEVEN THOUSAND ONE HUNDRED DOLLARS ($2,777,100), which would violate the Bank's loan to equity ratio and allow Jerry Kim with a loan of TWO MILLION SEVEN HUNDRED FIFTY THOUSAND ($2,750,000) to purchase the Property with essentially no money down.

23.

On April 24, 2008, Jerry Kim, without the knowledge and consent of all the members of First One, and at the instruction of the Bank, transferred his rights and

obligations under the Contract to First One so that that First One would be named as the primary party obligated on the loans for TWO MILLION SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($2,750,000) which was supposed to close in accordance with the Contract a few days later.

24.

At the time of the closing of the loans on April 29, 2008, the Bank, Chen and Zhou were aware that Jerry Kim had never operated an adult day healthcare facility; First One had no business need to purchase the Property; First One did not have a license from the State of Georgia to operate as an adult day healthcare facility anywhere; First One had not made any effort to seek a license from the State of Georgia to operate an adult day healthcare facility at the Property, and was unlikely to have such a license at anytime in the foreseeable future; First One had entered into a five (5) year lease for other premises that had a capacity for 240 clients and was still building out the leased space in those other premises; First One did not have one (1) single client; First One did not have any revenues; the Property was not built-out with tenant improvements but only consisted of the shell of part of the first floor of an existing commercial building; that to make the mortgage loan appear legal to regulators, at minimum, the Property would need to have the tenant improvements completed so that the loan could fit within the

trumped up appraisal value; that Jerry Kim, the Seller and others would be able to take money from the loans virtually at will without a substantial portion of the loan proceeds being used for working capital, tenant improvements, or other business needs of First One; that First One could not possibly repay the loans for TWO MILLION SEVEN HUNDRED FIFTY THOUSAND ($2,750,000); and that the loans were being funded even though not all conditions for funding established by the Bank's Board of Directors were met.  By closing the loans the Bank assumed a duty to administer the loans with reasonable care.

25.

On the date of the closing, April 29, 2008, the Bank's attorney drafted an escrow agreement (the "Escrow Agreement") and Jerry Kim, purporting to act on First One's behalf, entered into the Escrow Agreement with the Seller.  In the Escrow Agreement it states the purpose for which the escrowed funds are to be used: ". . . Seller and Purchaser acknowledge and agree that the Tenant Improvement Allowance ("Allowance") is to be used solely and exclusively for the purposes of improving the interior of the condominium unit or units being purchased by Purchaser from Seller, that no portion of the Allowance is to be used to reduce the purchase price or be used in lieu of earnest money deposit, or any

other deposit required by the Purchase Agreement for the purchase of the unit or units by Purchaser."

26.

The Escrow Agreement also identifies the Escrow Agent as Community One Associates, the property management agency, for Point Satellite Condominium Association, Inc.    Point Satellite Condominium Association, Inc., was a corporation ostensibly established to represent the condominium owners at the Point Satellite properties, but at that time, it was an entity owned and controlled by Onorato and Northpoint Group.

27.

In accordance with the Escrow Agreement, the Tenant Improvement Allowance was transferred from the Bank's attorney to a bank account controlled by Seller's property manager, Community One Associates, ostensibly for the purpose of paying for the build-out of the tenant improvements for the Property.

28.

According to the Escrow Agreement, release of the escrowed funds for the Net Tenant Improvement Allowance was conditioned upon submitted and approved building-plans and actual completion of construction and clean-up, but the Bank did not reserve the right to inspect the progress of construction, or to

supervise draw requests to be certain the improvements were being made to the Property and the loan proceeds were being properly applied as authorized in the Loan Agreement.

29.

Within a few days of the closing, the Bank's attorney transferred the sum of FOUR HUNDRED THIRTY-TWO THOUSAND NINE HUNDRED DOLLARS ($432,900.00) representing the Net Tenant Improvement Allowance to a bank account controlled by the Seller through Seller's agent, Community One Associates.

30.

On May 7, 2008, Jerry Kim, purportedly on behalf of First One, Northpoint and Grant K. Gibson ("Gibson"), an employee of Northpoint who worked for Onorato, entered into a written agreement titled Personal Property Trust Agreement (the "Trust Agreement"), prepared at the direction of Onorato, pursuant to which Jerry Kim agreed to receive the Net Tenant Improvement Allowance and endorse and deliver it over to Gibson, as trustee of Synetics Trust, who in turn was required by the Trust Agreement to distribute the Net Tenant Improvement Allowance in the amount of NINTETY-THREE THOUSAND DOLLARS ($93,000.00) to Northpoint, ONE HUNDRED SEVEN THOUSAND DOLLARS

($107,000.00) to John Kim, and TWO HUNDRED THIRTY-TWO THOUSAND NINE HUNDRED DOLLARS ($232,900.00) to First One.  Onorato arranged for Northpoint employee Gibson, to act as on Onorato's behalf for this purpose.

31.

The Trust Agreement was subsequently revised to show John Kim's share as going to First One.  Jerry Kim entered into the Trust Agreement and delivered the Net Tenant Improvement Allowance in the amount of $432,900 to Grant Gibson acting as agent for Onorato and Northpoint without the knowledge and consent of all of the members of First One.

32.

On May 19, 2008, Gibson, through the guise of Synetics Trust and acting as the agent of Onorato and Northpoint, obtained and delivered to Jerry Kim an official bank check from Wachovia Bank made payable to First One in the amount of THREE HUNDRED THIRTY-NINE THOUSAND NINE HUNDRED DOLLARS ($339,900), which was the sum of the $232,900 and $107,000 amounts identified in the Trust Agreement to be distributed to First One.

33.

At the time Gibson gave Jerry Kim the official bank check for THREE HUNDRED THIRTY-NINE THOUSAND NINE HUNDRED DOLLARS

($339,900), there had not been any plans completed for the build-out of the Property, no building permit had been obtained from the local building authority for the tenant improvement build-out, and no construction whatsoever had been performed by Jerry Kim or First One at the Property.

34.

Shortly after the THREE HUNDRED THIRTY-NINE THOUSAND NINE HUNDRED DOLLARS ($339,900) was received by Jerry Kim he deposited it into a First One checking account, and then without the knowledge and authority of all the members of First One, Kim paid virtually all of those same monies to his friends, family and himself and he left little or no money available for use of First One for any purposes whatsoever.

35.

After the closing, Jerry Kim delivered a written document addressed to Onorato which contained a calculation "[f]or the settlement" of the funds placed in trust with Gibson and requested a final check for THIRTY-EIGHT THOUSAND FIVE HUNDRED DOLLARS ($38,500). The calculation for the settlement showed the amounts of $432,900, the amount of the Net Tenant Improvement Allowance, and $160,500, the amount of the "decorating allowance" as being due, against which were credited the amounts of $200,000, $15,000 and $339,900 (the

amount delivered to Jerry Kim from the Net Tenant Improvement Allowance as mentioned above), leaving a balance claimed due from Northpoint and Onorato of $38,500.   Onorato and Jerry Kim then amended the Decorating Allowance Agreement to provide that NorthPoint would pay First One $38,500 to "settle this account in full".   The payment of this $38,500 in addition to the payment of the $339,900 allowed Jerry Kim to receive THREE HUNDRED SEVENTY-EIGHT THOUSAND FOUR HUNDRED DOLLARS ($378,400.00), which was FIFTY-FIVE THOUSAND ONE HUNDRED FORTY-EIGHT DOLLARS and SEVENTY-SEVEN CENTS ($55,148.77) more than the cash paid by Jerry Kim at closing.  This resulted in no cash being required to purchase the Property and more than Fifty Thousand Dollars being paid to Jerry Kim.

36.

The Bank breached its duty to underwrite and administer the mortgage loans with reasonable care and intentionally looked the other way, in that the Bank committed one (1) or more of the following acts and/or omissions as part of its plan to obtain a loan commitment fee, expand its asset base, and earn more profits, at the expense of First One:

(a)   The Bank knowingly, intentionally and/or recklessly or negligently allowed the loans to be made on the basis of a "unanimous" consent of members of First One that was not in fact "unanimous";

(b)   The Bank knowingly, intentionally and/or recklessly or negligently approved and funded the loans in violation of its own lending criteria and federal regulations;

(c)   The Bank knowingly, intentionally and/or recklessly or negligently split the loan for TWO MILLION SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($2,750,000.00) into two (2) smaller loans to make it appear to satisfy federal banking regulations and its own loan policies despite knowing there was a violation of loan to value ratios;

(d)   The Bank knowingly, intentionally and/or recklessly or negligently trumped up the appraised value of the Property;

(e)   The Bank knowingly, intentionally and/or recklessly or negligently labeled the smaller of the two (2) loans as being for "working capital" for a business that did not exist, and could not exist at that Property at that time;

(f)    The Bank knowingly, intentionally and/or recklessly or negligently allowed the "working capital" loan to be used for the benefit of the Seller, Oronato, Northpoint, John Kim, Team Spirit and Jerry Kim rather than for the working capital of First One;

(g)    The Bank knowingly, intentionally and/or recklessly or negligently allowed the distribution of the loan proceeds from the two (2) loans identified in the Bank's Complaint,  without any oversight by the Bank;

(h)    The Bank knowingly, intentionally and/or recklessly or negligently did nothing to ensure that the Property which served as its collateral for the loans would actually benefit from the tenant improvements;

(i)    The Bank knowingly, intentionally and/or recklessly or negligently did nothing to tie the distribution of escrowed loan proceeds to inspections and approvals by a professional architect or inspector hired by the Bank;

(j)    The Bank knowingly, intentionally and/or recklessly or negligently enabled the Seller, Onorato, Northpoint and Jerry Kim to control the escrowed monies such that Jerry Kim could substantially and

personally benefit from the loans without benefit or consideration to First One;

(k)   The fraudulent scheme of Jerry Kim, John Kim, Ron Onorato, and Northpoint Group could not be completed without the knowing, intentional and active participation of the Bank.

37.

As a direct and proximate consequence of the above-described acts and omissions of the Bank, First One has been damaged in that First One has been named as an obligor and paid several payments to the Bank on the fraudulent loans, and First One has had to incur attorney's fees in defending the Bank's Complaint and attempting to avoid the loans.

38.

If the Bank was to obtain judgment against First One on the promissory notes, the Bank would be receiving the benefit of the fraudulent, *ulta vires*, and/or criminal activity of itself and others, without any benefit or consideration having been provided to First One.

39.

As a result of the Bank's above-described acts and/or omissions,   the Bank is estopped from enforcing the promissory notes described in its Complaint and the related deeds to secure debt.

WHEREFORE, First One does hereby respectfully pray for judgment as follows:

(a)     Dismissing the Bank's Complaint with prejudice;

(b)     Awarding judgment to First One against the Bank for damages in such amount as shall be proved at the time of trial but which amount is believed to be not less than the full amounts that the Bank is seeking on the two (2) promissory notes described in its Complaint;

(c)     Awarding judgment to First One against the Bank for damages in an amount equal to all monies First One paid to the Bank on the two (2) promissory notes described in the Bank's Complaint plus interest at the legal rate thereon;

(d)     Awarding judgment to First One against the Bank for reasonable attorney's fees, court costs and litigation expenses incurred by First One;

(e)   Awarding judgment to First One against the Bank for punitive damages in such amounts as shall be awarded in the enlightened conscience of a jury; and

(f)   Such other and further relief as this Court may deem just and proper in the interest of law, justice and equity.

## DEFENDANT FIRST ONE GROUP, LLC'S THIRD-PARTY CLAIM AGAINST TEAM SPIRIT REALTY & INVESTMENT, INC., JOHN H. KIM, SAMUEL CHEN, ELAINE ZHOU, THE NORTH POINT GROUP, INC. AND RONALD ONORATO

COMES NOW Defendant and Third-Party Plaintiff First One Group, LLC ("First One") and hereby files this Third-Party Complaint against Team Spirit Realty & Investment, Inc. ("Team Spirit"), John H. Kim ("John Kim"), Samuel Chen, Elaine Zhou, The Northpoint Group, Inc. and Ronald C. Onorato, collectively the "Third-Party Defendants", and shows the following:

1.

First One repeats and realleges each Affirmative Defense and each and every allegation set forth above in Paragraphs 1 though 79 of its Answer and each and every allegation set forth above in Paragraphs 1 through 39 of its Counterclaim, and incorporates the same by reference as though fully set forth herein.

2.

First One is a Georgia corporation with its principal place of business and registered agent in Gwinnett County, Georgia.

3.

Team Spirit is a Georgia corporation with its principal place of business and registered agent in Gwinnett County, Georgia.  Process may be served through its registered agent John H. Kim, 2645 N. Berkeley Lake Road, Suite 230, Duluth, Gwinnett County, Georgia.

4.

John Kim is a resident of Georgia and may be served at 2645 N. Berkeley Lake Road, Suite 230, Duluth, Gwinnett County, Georgia.

5.

Samuel Chen is a resident of the State of Texas and may be served at 807 Skimmer Ct., Sugar Land, Texas 77478.  Third-Party Defendant Samuel Chen is subject to the personal jurisdiction of this Court, pursuant to O.C.G.A. § 9-10-91, in that all of his tortious acts and/or omissions occurred wholly within the State of Georgia, and caused injury to Third-Party Plaintiff within the State of Georgia.

6.

Elaine Zhou is a resident of Georgia and may be served at 1175 Clandon Place, Suwanee, Georgia 30024.

7.

Northpoint is a Georgia corporation with its principal place of business and registered agent in Fulton County, Georgia.  Process may be served through its registered agent Ronald C. Onorato, 6505 Shiloh Road, Suite 300, Alpharetta, Georgia 30005.

8.

Ronald Onorato is a resident of Georgia and may be served at 3959 St. Elizabeth Square, Duluth, Georgia 30096-8049.

9.

This Court has supplemental jurisdiction of this third-party complaint pursuant to 28 U.S.C. § 1367(a) because it is so related to claims asserted in this action that they form part of the same case or controversy under Article III of the United States Constitution.  The claims in this third-party complaint arise from the common nucleus of operative facts underlying the Bank's claim which invoked federal subject matter jurisdiction.

10.

Venue need not be proper because this is a third-party complaint for indemnification.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.  Venue is proper as to Team Spirit, John Kim, Elaine Zhou, Northpoint and Onorato pursuant to 28 U.S.C. § 1391(b)(1) and (c).

11.

The Third-Party Defendants individually and jointly caused any damages sustained by the Bank.

12.

First One is entitled to indemnification and/or contribution from the Third-Party Defendants for all amounts for which it may be found liable to the Bank and for all amounts which it already paid to the Bank.

WHEREFORE, First One does hereby respectfully pray for judgment as follows:

(a)   A judgment against the Third-Party Defendants individually and jointly for indemnification or contribution for all amounts which the Bank is awarded against First One;

(b)   A judgment against the Third-Party Defendants individually and jointly all monies First One paid to the Bank on the loans described in the Bank's Complaint plus interest at the legal rate thereon;

(c)   A judgment against the Third-Party Defendants individually and jointly for the reasonable attorney's fees, court costs and litigation expenses incurred by First One;

(d)   A judgment against the Third-Party Defendants individually and jointly for punitive damages in such amounts as shall be awarded in the enlightened conscience of a jury; and

(e)   Such other and further relief as this Court may deem just and proper in the interest of law, justice and equity.

This 10th day of December, 2012.

> Respectfully submitted,
>
> NORTH ATLANTA LAW GROUP, P.C.
> Attorneys for First One Group, LLC
>
> By:  /s/ Steven M. Jampol
>       Steven M. Jampol
>       Georgia Bar No. 389435
>       Howard A. Salk
>       Georgia Bar No. 707046

2475 Northwinds Parkway, Suite 130
Alpharetta, Georgia 30009
Telephone: (770) 667-1290
Facsimile:  (770) 667-1690
sjampol@northatlantalaw.net
hsalk@northatlantalaw.net